# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

BRENDA FORD,                        )
       Plaintiff,              )
                     )
      v.                          )     CAUSE NO: 2:07-CV-21-PRC
                     )
GARY COMMUNITY SCHOOL       )
CORPORATION,                        )
       Defendant.              )

## OPINION AND ORDER

This matter is before the Court on a Motion of Defendant for Summary Judgment [DE 70], filed by Defendant Gary Community School Corporation ("School Corporation") on January 14, 2010.  The Court grants the Motion for Summary Judgment in favor of the School Corporation as to Plaintiff Brenda Ford's federal and state law claims.

## PROCEDURAL BACKGROUND

On June 23, 2006, Ms. Ford, who has been employed by the School Corporation in a secretarial position since August 24, 1978,  filed a charge of discrimination based on disability with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that she had been harassed and intimidated by the School Corporation and that on June 21, 2006, she was "suspended pending discharge under false pretense."  On October 26, 2006, a Notice of Right to Sue was issued by the EEOC.

Ms. Ford filed a Complaint against the School Corporation in this Court on January 24, 2007. In Count I, Ms. Ford alleges a claim of disability discrimination under the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*., asserting that, based on her disability, the School Corporation willfully suspended her; limited, segregated, or classified her in a way that deprived her of employment opportunities; and altered the terms and conditions of her employment

and reduced the privileges of employment. Ms. Ford also alleges Indiana state law claims of intentional infliction of emotional distress in Count II, negligent infliction of emotional distress in Count III, and defamation per se in Count IV. On all counts, Ms. Ford seeks various injunctive relief, damages, punitive damages, interest, costs, and reasonable attorney's fees.

On April 2, 2007, the School Corporation filed an Answer and Affirmative Defenses.

On November 2, 2007, Ms. Ford filed an Amended Complaint to show that, on April 12, 2007, she filed a Tort Claim Notice pursuant to Section 34-13-3-8 of the Indiana Code.

On December 12, 2007, the School Corporation filed a Motion to Dismiss which was denied by District Court Judge Joseph Van Bokkelen on September 25, 2008. On November 13, 2008, the School Corporation filed an Answer to the Amended Complaint.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case, and the case was reassigned to the undersigned Magistrate Judge on December 15, 2008. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

On January 14, 2010, the School Corporation filed the instant Motion for Summary Judgment and a Memorandum in Support. On February 19, 2010, Ms. Ford timely filed a response in opposition summary judgment. The School Corporation has not filed a reply, and the time to do so has passed.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that the opposing party's "response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## MATERIAL FACTS

### A. Ms. Ford's Background and Employment with the School Corporation

Ms. Ford weighs 130 pounds (as of June 3, 2006), is 5'1" in height and was born in June 1958. On April 11, 1978, Ms. Ford made an application for the position of Secretary with the School Corporation. On her application, Ms. Ford indicated special skills and training or experience

with respect to equipment and machines for calculator, filing, typing, switchboard, and Xerox machine-key operator. She also stated that she did not have any physical disabilities, had not been treated for any mental illness and had not ever been hospitalized for a serious illness. On August 24, 1978, the School Corporation issued an identification card to Ms. Ford which described her position as "Sub. Secretary." On September 11, 1978, the School Corporation administered various employment-related tests to Ms. Ford, and the results showed that she passed each of the tests for general ability, verbal aptitude, clerical perception, numerical, and finger dexterity and that she typed 45 words per minute with nine errors.

On May 22, 1979, the Board of School Trustees ("School Board") approved the Superintendent's recommendation for the appointment of Ms. Ford "to a position with the Gary Community School Corporation." In August, 1979, Ms. Ford was hired as a Secretary and assigned to Lew Wallace High School by the School Corporation. On September 3, 1981, Ms. Ford applied for another job with the School Corporation, which was described as "Service Center–Offset Operator–Class III." In requesting to be transferred or considered for the other job, Ms. Ford stated the following, "I am asking you to consider me for the above opening. My file will show that my former job offered me the experience on the various machine listed; for example: operating Xerox, servicing Xerox, switchboard and stamp machine. I feel that I am physically strong to lift paper loads and heavy mail bags." On or about 15 September 1981 Ford was given the job title of "Secretary/Class I Guidance/B.S." and assigned to the location of "Business Services/Machine Room/SWBD" and given the position of "Offset Operator–Class III" with an effective date of September 21, 1981. The job title of "Offset Operator, Class III" requires that the employee assigned to the job "assist in the efficient processing of paper" and that the employee be able to see,

hear, stand, walk, climb, stoop, kneel, lift, push, pull, and finger, grasp, and feel office equipment. (Ex. SC11, p. 120).

In a Memorandum dated November 8, 1984, the School Corporation described Ford's position as "Secretary–Class III on Class IV salary" and assigned her to the building known as Business Services with an effective date of September 21, 1984. The Memorandum provided: "Retroactive to 9-21-84, Brenda Ford is to be advanced to the Class IV salary lane. Ms. Ford has been a Class III Offset Operator in the Machine Room since 9-21-81." (Ex. SC17).

In June 2003, Ms. Ford was given a Job Performance Evaluation by the School Corporation. The results of the June 2003 Job Performance Evaluation of Ford were as follows:

| JOB PERFORMANCE REVIEW ITEM | GRADE |
|---|---|
| Personal Appearance: Dress, make-up, cleanliness, etc. | A |
| Speech: Ability to speak clearly and use proper English | B |
| Human Relations | C |
| Emotional Stability: Ability to adjust under varying situations | B |
| Work Habits and Attitudes | |
|    Solves problems wisely | B |
|    Tends to her job with minimal supervision | B |
|    Follows written and oral instructions | B |
|    Works efficiently | B |
|    Uses initiative to get things done | A |
|    Is punctual | B |
|    Cooperates and works well with others | C |
|    Accepts additional duties willingly | B |
|    Shows proper office manners and courtesies on phone and in public contacts | B |
|    Accepts criticism | C |
|    Respects school property | A |
|    Carries out assignments promptly | B |
|    Organizational skills | B |
|    Usage of calculator | |
|    Usage of Xerox and other reproducing machines | A |

In the remarks section of the June 2003 Job Performance Evaluation, Ford stated, "This evaluation is unfair and undeserving . . . . I should be commended and upgraded to Head Secretary. Being in this dept. for 23 years, handling daily office wk. this evaluation is a disappointment to me personally and professionally. Dated 7/2003." (Ex. SC33).

On her 2003, 2004, 2005, 2006, and 2007 U.S. Individual Income Tax returns, Ms. Ford reported gross income of $28,725.00, $32,834.00, $31,000.00, $30,160.00 and $30,318.00 respectively. On her 2005 U.S. Individual Income Tax return, Ms. Ford described her occupation as "secretary."

On a May 22, 2006 Job Performance Evaluation, Ms. Ford was given an overall average score of 3.12, which means she was meeting her employer's expectations. With respect to the operation of copy and reproduction machines, as of May 2006, Ms. Ford exceeded the School Corporation's expectations. As of May 2006, the person directly responsible for Ms. Ford's Job Performance Evaluation was Kerry Triplett.

On June 14, 2006, the Post Tribune newspaper reported that "[a] 107 page Gary School District document requesting proposals for private contractors to take over management of school facilities has riled union employees." (Ex SC1). The article described the proposal as a bid request document that was "issued by Interim Purchasing Director Kerry O. Triplett" and "asked for 'sealed offers' from 'qualified firms' to negotiate the design and provision of a maintenance plan that will yield 'higher levels of service in an environment of decreasing resources.'" (Ex. SC1).

On June 21, 2006, the Chief Financial Officer for the School Corporation, Joseph Jones III, informed Ms. Ford, by letter, that she had "been suspended without pay pending a decision on whether to recommend to the Board of School Trustees that [her] employment services be

terminated." (Ex SC9). Mr. Jones informed Ms. Ford, by letter, on June 21, 2006, that "[a] preliminary investigation has established facts of your complicity in the unauthorized procurement and distribution of a confidential and investigative document belonging to the . . . School Corporation." (Ex. SC9). Mr. Jones further stated that her "failure to appear at a requested meeting on June 21, 2006 at 2:00 p.m." constituted insubordination. (Ex. SC9).

On June 23, 2006, Ms. Ford filed a grievance with the School Corporation and alleged violations of the Collective Bargaining Agreement ("CBA"), asserted in part that she was "being singled out for filing a Worker's Compensation claim against the" School Corporation, and claimed that "[h]er rights under the Americans with a Disability Act of 1990 have been violated . . . . " (Ex. SC8).

On June 23, 2006, Ms. Ford also filed a Charge of Discrimination with the EEOC and the Gary Human Relations Commission. In the Charge, Ms. Ford checked the box for "Discrimination Based on Disability," averred that the dates of discrimination took place on the earliest date of June 23, 2006, and the latest date of June 23, 2006, left the box under "Dates Discrimination Took Place for Continuing Action" blank, and listed the number of Defendant's employees as 101-200. (Ex SC35). Ms. Ford wrote in the Charge: "I am a qualified individual with a disability hired by the Respondent on August 24, 1978. My position is secretary. I feel I have been harassed and intimidated by the Administration. On June 21, 2006 I was suspended pending Discharge under false pretense. I believe I have been discriminated against on the basis of my Disability, which is in violation of the Americans with Disability Act of 1990." (Ex. SC35).

On July 7, 2006 the Post Tribune reported that "[t]wo school employees have been suspended and face termination in the wake of a public melee over possible school district outsourcing." (Ex SC1).

On July 12, 2006, Mr. Jones issued a letter, via certified mail, to Ms. Ford with the subject matter: "Unauthorized Procurement and Distribution of a Confidential and Investigative Document," "Violation of Board Policy 616 (Theft, Conversion and False Claims)," and "Insubordination." (Ex. SC14). In the letter, Mr. Jones stated,

> As a result of the incident that occurred on Monday, June 12, 2006, and your failure to appear at a scheduled meeting on Wednesday, June 21, 2006, you have been charged with violation of Board Policy 616 (Theft, Conversion and False Claims) and insubordination. A disciplinary/grievance hearing has been scheduled for you on Thursday, July 27, 2006 at 1:00 p.m. in the conference room of the Corporation's Human Resource Department.

(Ex. SC14).

On August 14, 2006, the School Corporation responded, in writing, to Ms. Ford's Charge of Discrimination with the EEOC, stating,

> On June 12, 2006 a district document that was not meant for public distribution was taken from the Center and passed out to employees and the general public. Ms. Ford's son was seen on tape going into and leaving the Distribution Center with a box of documents and again on tape bringing the box into the maintenance building where the documents were distributed to the workers. On June 21, 2006 she was summoned to a meeting by the Chief Financial Officer concerning the above matter and never showed up.

(Ex. SC36). Denying any form of discrimination, the School Corporation explained that Ms. Ford

> had a Worker's Compensation injury that left her with 20% permanent partial impairment. However, this claim was settled with a lifetime benefit of a drug card limited to the purchase of those medications for her condition and four (4) visits per year to her doctor. She was also awarded $26,000.00 for her 26% partial impairment.

*Id.*

On August 25, 2006, Mr. Jones issued a Decision and Recommendation following the July 27, 2006 grievance hearing, recommending that Ms. Ford be terminated as a School Corporation employee. On October 13 and 20, 2006, the School Board conducted hearings concerning Ms. Ford's suspension and Mr. Jones' recommendation for termination. From approximately June 21, 2006, to October 13, 2006, Ms. Ford was suspended without pay. On October 17, 2006, Ms. Ford was given a temporary secretarial assignment in the Special Education School pending a further decision by the School Corporation.

On October 26, 2006, the EEOC dismissed Ms. Ford's Charge of Discrimination, stated that it was "unable to conclude that the information obtained establishes violations of the statutes," and issued a Notice of Right Sue. (Ex. SC37).

On November 13, 2006, the School Board ordered that Ms. Ford be reinstated with full salary and benefits and that she be given retroactive pay to the first day of her suspension.

On December 6, 2006, the Interim Executive Director of the School Corporation's Human Resources Department, Mr. Willie Cook, issued a letter to Ms. Ford, via certified mail, return receipt requested, stating the following, "Please be advised that effective Wednesday, December 6, 2006 your new assignment will be Class III Requisition Secretary at Lew Wallace High School beginning at 8:30 a.m." (Ex. SC 39). This letter was sent to Ms. Ford at her home address via certified mail, return receipt requested, and was returned to Mr. Cook as unclaimed.

On December 18, 2006, Mr. Cook issued a Memorandum to Ms. Ford stating that "per the outcome of her hearing, Ms. Ford was placed at Lew Wallace" with an effective date of December 7, 2006. (Ex SC40). On January 2, 2007, Ms. Ford issued a Memorandum to Dr. Mary Steele, the School Superintendent, confirming a December 22, 2006 meeting and stating "[t]his letter is in

response to your question: If I were unable to return to my position in the Machine Room, what position would I consider as a 2nd choice/position? 1st Choice: Machine Room Class III, 2nd Choice, Superintendent, Class III." (Ex. SC22).

On January 3, 2007, Mr. Triplett issued a Memo to Ford instructing her to "pick up your personal items from the Service Center Distribution Center, Friday, January 12, 2007 at 10:00 a.m." (Ex. SC23).

Prior to March 26, 2007, Ms. Ford filed a Step Two Grievance regarding the School Corporation's decision to relocate her from the School Service Center to Lew Wallace High School on December 6, 2006. On March 26, 2007, in a Step Two Grievance Decision, the Supervisor of Secretaries, Patricia L. Hughes, summarized Ms. Ford's contention that she "was informed on November 14, 2006 that she was being moved out of her job in the Machine Room and would be placed permanently somewhere else," (Ex. SC42) which Ms. Ford alleged violated the CBA under Article V and Article X § 13. The Decision reported that her grievance was denied because "[t]he administration was given the authority from the Board of School Trustees to place Ms. Ford." (Ex. SC42).

On May 7, 2007, a Step Three Grievance Hearing was held and conducted regarding Ms. Ford's reassignment from the School Service Center to Lew Wallace High School. At the hearing, Ms. Ford contended that she should be permitted to remain "on the job she held for 25 years in the Machine Room at the Service Center." (Ex. SC43). In denying the grievance, Mr. Cook stated that "good and just cause to involuntarily transfer" Ms. Ford from the Machine Room to Lew Wallace High School existed because "[t]he integrity of the persons working [in the Machine Room] must be beyond reproach," and that "under Ms. Ford's watch" workplace confidentiality had been

breached as a result "of the distribution of confidential information obtained from the Machine Room" where Ms. Ford worked. (Ex. SC43). He noted that, although "the Board did not find sufficient evidence <u>to terminate</u> Brenda Ford, there yet remains the question of the distribution of confidential information obtained from the Machine Room." *Id.* (emphasis in original).

On June 5, 2007, Ms. Ford was given a Job Performance Evaluation concerning which she scored an overall average of 2.806, which equates to "some difficulties, corrective plan of action." (Ex. SC44). On a July 8, 2008 Job Performance Evaluation, Ms. Ford scored an overall average of 3.05 and was exceeding the School Corporation's expectations with respect to her job performance.

On September 11, 2008, Ms. Ford was issued a Certificate of Accomplishment regarding a typing test where she typed 33 words per minute with 93% accuracy. On September 18, 2008, Ms. Ford was issued a Certificate of Accomplishment regarding a typing test where she typed 31 words per minute with 95% accuracy.

On July 23, 2009, Mr. Cook issued a letter to Ms. Ford informing her that her assignment for the 2009-2010 school year was at Lew Wallace High School in the position of Requisition Secretary. An August 3, 2009 Memo informed Ms. Ford that, even though her Requisition Secretary position is 41 weeks annually, she "will continue to work 52 weeks in [the] position [of Requisition] until a 52 weeks position is available or until she bids out of current position." (Ex. SC47).

### B. Collective Bargaining Agreement & School Corporation Policies

Ms. Ford is a member of the Union. The CBA between the School Corporation and Ms. Ford's union sanctions "the contracting out of work . . . [when it] is deemed necessary to the efficient operation of the . . . School Corporation," (Ex. SC25, § 4 p. 2); states that secretarial positions are deemed to be vacant "through a resignation, termination, retirement, new position [or]

transfer," *id*. at § 1(A) p. 17; authorizes the involuntary transfer or demotion of an employee by the School Corporation only when "good and just cause" exists, *id*. at § 9 p. 19; provides that the "[a]llotment of secretarial and clerical positions for the School Service Center Offices, in both number and classification, will be made by the Superintendent of Schools," *id*. at § 3 p. 20; and mandates that "the Superintendent shall appoint someone from the Secretarial Unit as Supervisor of Secretaries," *id*. at § 3 p 24.  The CBA also sets forth a mandatory "Grievance Procedure" "in the event an employee believes there is a basis for a grievance."  (Ex. SC25, p. 21).

The School Corporation maintains Policy 616 regarding property control, theft, conversion, and false claims, which requires that the Superintendent conduct investigations into the loss of property or goods and services.  Policy 438 addresses the suspension of School Corporation employees and provides:

> The superintendent and his/her designated representative may relieve any employee of the corporation from duty whenever such action appears necessary and in the best interest of the students or the effectiveness of the operation of schools. Where grounds for immediate suspension are indicated, the superintendent will take such action and notify the Board at the earliest opportunity. Due process will be in accordance with state statute or collective bargaining agreements.

(Ex. SC48).  Policy 438, regarding the suspension of employees, provides: "Employees may be suspended from duties immediately for immorality, insubordination, neglect of duty or other good and just cause." (Ex. SC48).  Policy 409, regarding on-the-job injuries, requires that when an employee is injured on the job, the employee must "report the injury to the immediate supervisor." (Ex. SC48).

### C. Ms. Ford's Injury

Ms. Ford sustained an on-the-job injury on January 7, 2000, for which the School Corporation has paid, as per the terms and conditions of a settlement agreement, the total amount of $128,572.88 to healthcare providers who provided medical treatment and medical services to Ms. Ford during the period January 2002 to and including October 2003. On March 2, 2000, the School Corporation agreed to compensate Ms. Ford for her Worker's Compensation claim by paying her $334.33 per week. In February 2000, Ms. Ford was released to return to light-duty work with no lifting over five pounds with her left arm. In July 2000, she was released to return to light-duty work with no lifting over five pounds with her left arm. In August 2000, Ms. Ford's wrist pain had resolved, although she had muscular forearm pain. In September 2000, Ms. Ford was released to work on light duty.

On November 14, 2000, Dr. Schwartz recommended that Ford "have a permanent restriction of no lifting greater than 5 pounds with the left arm." (Ex. SC61). On September 11, 2001, Dr. David Rothbart stated that Ms. Ford "is requesting a disability placard, although she is clearly able to ambulate well." (Ex. SC67). On February 20, 2002, Dr. Scott A. Andrews stated Ms. Ford "probably can return to work without restrictions as of March 4, 2002." (Ex SC74). On March 14, 2002, Dr. Andrews reported that Ms. Ford "can return to work without restrictions at all as far as this left hand and arm are concerned." (Ex. SC76). On May 21, 2002, Dr. Andrews reported that Ms. Ford "can continue to work with the only restriction being no excessive stair climbing." (Ex. SC77).

On May 22, 2002, Dr. Jonathan R. Javors reported that Ms. Ford "can continue to work as a copier." (Ex. SC78). In June, August, and September 2002, Dr. Andrews reported that Ms. Ford

"can continue to work without restrictions." (Exs. SC79, SC81, SC82). On March 17, 2003, the Methodist Hospitals instructed Ms. Ford to return to work with a restriction of "no lifting greater than 50 pounds." (Ex. SC84).

On September 24, 2004, via an approved stipulation, Ms. Ford and the School Corporation agreed, for purposes of the Worker's Compensation claim, that Ms. Ford be awarded "$26,000.00 for her [26%] permanent partial impairment of the whole person" and that for the duration of Ms. Ford's life, the School Corporation would pay for certain medical visits and medications "related to the injuries suffered on January 7, 2000."

In July 2005, in a progress report, Ms. Ford was advised to use a "TENS unit 3 times each week for 15-30 minutes each treatment on her shoulder/arm/neck area." (Ex. SC28).

Ms. Ford's current Indiana Operator Driver License was issued to her in June 2006, expires in June 2012, and requires that Ms. Ford must wear glasses or contacts while driving. Ms. Ford drover her car, a 2004 Chevy, to the deposition held on December 16, 2009, and has no problem driving a car.

As of 2003, Ms. Ford, age 51, lived alone at her residence in Gary, Indiana. Ms. Ford's son, James Ford, moved out of her home in 2003. Ms. Ford's residence is a brick frame home on one floor with a basement and a garage and has stairs leading to the basement which Ms. Ford uses on a regular basis. Ms. Ford graduated from Lew Wallace High School and attended I.U. Northwest but did not receive a degree.

Ms. Ford describes her disabilities as "permanent nerve and muscle damage" on her left side. Prior to June 2006, Ms. Ford's medical condition was stable. From 2004 to December 2009, Ms. Ford's medical condition was stable and she was able to function and to engage in normal activities

about 80% of the time. As of June, 2006 Ford was functioning and working despite her alleged disability – muscle and nerve damage on the left side of body from her neck to her hand. Ms. Ford can and does drive a car and attends to her personal hygiene needs by brushing her teeth, combing her hair, dressing herself, bathing herself, getting in and out of the bathtub or shower, and can and does cook for herself by removing pots and pans to and from the stove, all of which activities are performed by using her two hands.

### D. The Nature of Ms. Ford's Employment and Job Responsibilities

Ms. Ford has been employed by the School Corporation as a Secretary since 1978, and has worked in a secretarial position as Machine Operator in the School Corporation's Central Office from 1980 to June 2006. As a Machine Operator, Ms. Ford was required to photocopy documents and do all the printing in the Administration Building. The photocopying machines, known as multigraphics duplicating machines, were 21 feet long and occupied a space "from one wall to the other." Ms. Ford ordered materials and supplies for the copying machines, which required her to physically write down the supplies and place the orders. Ms. Ford was required to engage in heavy lifting, to make copies of documents, and copy from 20 to 30,000 documents, and she removed documents from the copiers and placed them in a box or on a cart or table, sometimes without assistance. During the time she worked there, there were between two and three copying machines in the Machine Room that were capable of doing all the copying. A cart could hold several thousand documents, consisting of 10 to 25 reams of paper. Ms. Ford was required to physically push the carts of papers to other parts and locations of the Administration Building, about a distance of 250 feet.

As Machine Operator, Ms. Ford was the mail agent for the School Corporation as she handled both the U.S. mailing process and School Corporation mailing process. School Corporation mail involved the internal distribution of incoming mail. The U.S. mailing process required Ms. Ford to place postage on outgoing mail by using a Pitney Bowes postage machine and taking it to the U.S. Post Office at 15th Avenue and Martin Luther King Dr., Gary, located about a mile from 620 E. 10th Place. During the time she worked as Machine Operator, Ms. Ford physically lifted boxes of mail, about 10 inches deep by 13 inches in length by 1 foot wide, carried them to her vehicle, transported these to the U.S. Post Office at 15th Avenue and Martin Luther King Drive, and removed the boxes from her vehicle. To distribute internal mail within the School Corporation Administration Building or to other school properties, Ms. Ford walked to the front of the Administration Building to gather mail bags that had been delivered from satellite school locations to the Administration Building. In 2006 there were 25 or 30 operating schools in the Gary School Corporation. Picking up and distributing the mail internally required bending, stooping, and standing. Exhibit SC11 correctly and accurately describes Ford's duties and responsibilities as a Machine Operator. From mid 2005 to June 2006, Kerry Triplett was her Supervisor.

In June 2006, Ford was suspended from her position as a Machine Operator, and in December, 2009, she was transferred to the position of Secretary. Ms. Ford is currently assigned to Lew Wallace High School as a Requisition Secretary. In this position, Ms. Ford places orders for supplies and materials, handles school mail, U.S. mail, distributes materials, answers the phone, and works at a desk. Ms. Ford disapproves of her transfer from the Machine Room and does not like it.

Other than being reassigned from the Machine Room, Administration Building, 620 E. 10th Place, to Lew Wallace High School, Ms. Ford has not had any material change in her employment

relationship with the School Corporation. Ms. Ford's salary has not changed since June 2006. In fact, her wages have increased since June 2006. She has the same health insurance coverage she had in June 2006, and her insurance benefits plan remains the same.

As of December 2006, Ms. Ford's former job of Machine Operator was filled by another person.

## ANALYSIS

The School Corporation seeks summary judgment in its favor on the claims in Ms. Ford's Amended Complaint, which are a federal claim of disability discrimination under the ADA and state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation. The Court considers each in turn.

### A. Americans With Disabilities Act

*1. Exhaustion of Administrative Remedies*

The School Corporate argues that Ms. Ford failed to exhaust her administrative remedies on her claim that she was discriminated against based on a disability when she was reassigned to the job of Secretary at Lew Wallace High School in December 2006 because she did not include the reassignment in her Charge, the EEOC issued its Right to Sue Notice prior to her reassignment, and she did not file an amended EEOC charge or a new charge. Ms. Ford offers no response to this basis for granting summary judgment on her federal claim.

As a prerequisite to filing a complaint under the ADA, a plaintiff must first file a timely charge of employment discrimination with the EEOC that encompasses the conduct complained of and must receive a statutory notice of right to sue from the EEOC. 42 U.S.C. § 2000e-5(e), (f); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d

497, 500 (7th Cir. 1994); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985); *see also Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) (noting that the ADA's enforcement mechanism incorporates the Title VII rules); *Basith v. Cook County*, 241 F.3d 919, 931 (7th Cir. 2001) )(recognizing that an ADA plaintiff may not pursue claims in court that she neglected to include in her underlying charge before the EEOC). Therefore, as a general rule, the plaintiff cannot bring a claim in a lawsuit that was not encompassed in the EEOC charge. *Cheek*, 31 F.3d at 500 (citing *Alexander*, 415 U.S. at 47).

To determine whether an EEOC charge encompasses the claims alleged in the complaint, courts apply the *Jenkins* test by considering whether the discrimination claims set forth in the complaint (1) are like or reasonably related to the allegations of the EEOC charge, and (2) can reasonably be expected to grow out of such allegations. *Cheek*, 31 F.3d at 500; *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir.), *cert. denied*, 429 U.S. 986 (1976). At a minimum, a factual relationship must exist between the EEOC charge and the complaint such that the charge and the complaint describe the *same conduct* and implicate the *same individuals*. *Gawley v. Indiana Univ.*, 276 F.3d 301, 313 (7th Cir. 2001); *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996) (citing *Cheek*, 31 F.3d at 501).

This filing prerequisite "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation and persuasion, and of giving the employer some warning of the conduct about which the employee is aggrieved. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001) (quoting *Cheek*, 31 F.3d at 500). Therefore, "allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party

of notice of the charge." *Cheek*, 31 F.3d at 500 (citing *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1110 (7th Cir. 1992)); *see also Babrocky*, 773 F.2d at 863. However, because EEOC charges are often completed by laypersons, the plaintiff need not allege each and every fact in the charge that, in the aggregate, form the basis of the claims in the complaint. *Cheek*, 31 F.3d at 500; *Babrocky*, 773 F.2d at 865-66 (holding that it is an error for a court to require an exact correspondence between the words of an EEOC charge and the contents of a Title VII complaint and that EEOC charges are to be construed with "utmost liberality"). Accordingly, the *Jenkins* test for determining whether an EEOC charge encompasses the claims in the complaint grants a plaintiff significant leeway. *Cheek*, 31 F.3d at 500.

In this case, Ms. Ford's EEOC Charge was filed on June 23, 2006, and provided, in relevant part:

> I am a qualified individual with a disability hired by the Respondent on August 24, 1978. My position is secretary. I feel I have been harassed and intimidated by the Administration. On June 21, 2006 I was suspended pending Discharge under false pretense. I believe I have been discriminated against on the basis of my Disability, which is in violation of the Americans with Disability Act of 1990.

(Ex. SC35). The Charge lists the earliest and latest date upon which discrimination occurred as June 23, 2006, and the box to designate her case a "continuing action" was not checked. However, in both her Complaint and her deposition testimony, Ms. Ford alleges that her initial transfer to the position of secretary at the Special Education School on October 16, 2006, as well as her later reassignment to the position of Requisition Secretary at Lew Wallace High School on December 6, 2006, violated the ADA. In her Complaint, Ms. Ford identifies events that occurred on June 9, October 16, November 13, and December 6, 2006, none of which are referred to in the June 23, 2006 EEOC Charge.

There is no mention in the EEOC Charge of Ms. Ford's claim that her initial transfer to the position of Secretary at the Special Education School and then her reassignment to Requisition Secretary at Lew Wallace High School was based on discrimination in violation of the ADA. The language of the EEOC Charge limits Ms. Ford's ADA claims to the June 21, 2006 suspension and the purported acts of discrimination that were alleged to have occurred on June 23, 2006. Ms. Ford could not reasonably expect that the EEOC Charge encompasses these later alleged discriminatory events because the EEOC issued its Right to Sue letter on October 26, 2006. Ms. Ford cannot argue that the October and December reassignments are like or reasonably related to the allegations of the EEOC charge or can reasonably be expected to grow out of such allegations as the reassignments implicate entirely different employment decisions than the suspension identified in the Charge.

On July 17, 2006, the School Corporation gave notice of a grievance hearing regarding the June 21, 2006 suspension scheduled for July 27, 2006. The resulting decision was issued on August 25, 2006, recommending that Ms. Ford's employment be terminated. On October 16, 2006, approximately nine days prior to the issuance of the EEOC's Right to Sue notice, the School Corporation reassigned Ms. Ford to the position of Secretary of Special Education. Meanwhile, on October 13, 2006, the School Corporation conducted the first of two hearings on Ms. Ford's grievance. At no time did Ms. Ford amend her Charge or file a second EEOC charge regarding the October 16, 2006 transfer. On November 17, 2006, at Step 4 of the grievance process, the School Board found that Ms. Ford's employment should not be terminated and that she should be reinstated with "full salary and benefits" and with back pay "to the first day of suspension." On December 6, 2006, Ms. Ford was reassigned to the position of Requisition Secretary at Lew Wallace High School. Ms. Ford argues that the result of the November 17, 2006 decision should have led to her

reinstatement in the Machine Room rather than her reassignment to Requisition Secretary. Once again, however, Ms. Ford did not amend or file a new charge regarding her December 6, 2006 reassignment.

Although the parties are the same, the October and December 2006 events are not the "same conduct" as the June 2006 suspension alleged in the EEOC Charge. The Court finds that the circumstances of the suspension for Ms. Ford's alleged dissemination of confidential documents and the subsequent reassignment at Step 4 of the grievance process are sufficiently different that the later could not be expected to grow out of the allegations related to the suspension. The EEOC had issued its letter six weeks prior to this alleged instance of discrimination, and, thus, Ms. Ford failed to exhaust her administrative remedies as to the October 16, 2006 transfer and the December 6, 2006 reassignment. Summary judgment in favor of Defendant on these claims is proper on this basis. However, Ms. Ford did exhaust her administrative remedies for her ADA claim based on her June 21, 2006 suspension.

*2. Merits of Ms. Ford's Disability Discrimination Claim*

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Because Ms. Ford does not attempt to prove her case of discrimination with direct evidence, she must proceed under the indirect method by first establishing a prima facie case of discrimination, which requires a showing at the first three steps that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) she suffered an adverse

employment action because of her disability.  *See Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005).  At the fourth step of the prima facie case, if a plaintiff cannot identify a similarly situated employee, as in the instant case, the Seventh Circuit has said that the prima facie test as a whole "requires a showing that the circumstances surrounding the adverse action indicate that it is more likely than not that [her] disability was the reason for it." *Timmons v. GMC*, 469 F.3d 1122, 1126 (7th Cir. 2006) (citations and internal quotation marks omitted).  The burden then shifts to the School Corporation to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  Finally, Ms. Ford must demonstrate a genuine dispute of material fact that the School Corporation's proffered reasons are pretextual to survive summary judgment.  *Id.*

Under the first prong of the prima facie case, Ms. Ford may demonstrate that she is disabled within the meaning of the ADA by showing either (1) that she has a physical or mental impairment that substantially limits her in one or more major life activities; (2) that she has a record of such an impairment; or (3) that her employer regarded her as having such an impairment.  *Id.* (citing 42 U.S.C. § 12102(2)).  In response to summary judgment, Ms. Ford asserts only that she was "regarded as" having a disability by the School Corporation because it was aware of her worker's compensation case resulting from the injury to her wrist in 2000.

A plaintiff can demonstrate that she is "regarded as" having a disability in one of three ways: (1) the employer treats the employee's non-substantially limiting impairment as constituting a substantially limiting impairment; (2) the employer regards an employee without a substantially limiting impairment as having one; or (3) the employee's impairment is only substantially limiting because of the attitudes of others toward the impairment.  29 C.F.R. § 1630.2( l ).  An employer's knowledge of an individual's impairment is not enough; the employer must also believe that it

substantially limits a major life activity.  *See Squib v. Mem'l Med. Center*, 497 F.3d 775, 786 (7th Cir. 2007).

Ms. Ford suffered a dislocated left wrist on January 7, 2000, arising out of and in the course of her employment with the School Corporation.   Ms. Ford received a settlement from the School Corporation that included compensation for her permanent partial impairment of the whole person as well as payment by the School Corporation for four doctor visits per year related to the injury. Ms. Ford continues to receive treatment for her left arm, although her left wrist pain had resolved. Following the injury, Ms. Ford was off work for a period of time.  Ms. Ford suggests in her response brief that the School Corporation's knowledge of her injury and impairment "could lead to an inference that the [School Corporation] discriminated against her on a perceived disability."  Pl. Br., p. 5.

Although the School Corporation may have been aware that Ms. Ford had an impairment, Ms. Ford has not offered any evidence that the School Corporation believed she had an impairment that limits a major life activity and regarded her as disabled.  Rather, all of the evidence suggests that, despite any residual impairment from her 2000 injury and any knowledge the School Corporation had of both the initial injury and her residual impairment, Ms. Ford continued to work for the School Corporation as a Machine Operator until June 2006 without incident and that she was meeting the expectations of her supervisors.  Ms. Ford was hired in August 1978 as a Secretary.  She was injured in January 2000, and although she was off work for a period of time, Ms. Ford was ultimately released by Dr. Andrews in 2002 to work with no restrictions.   In June 2003, after her return to work and prior to her suspension, Ms. Ford received a positive performance review, although she expressed dissatisfaction with the review because she had not been "upgraded to head

secretary." (Ex. SC33). In her job as a Machine Operator, which is described at length in the Factual Background, Ms. Ford was required to see, hear, stand, walk, climb, stoop, kneel, lift, pull, finger, grasp, and feel in order to operate the copy equipment and she performed her duties and responsibilities of lifting documents, placing documents in boxes and on carts, pushing documents on carts, processing incoming and outgoing mail, and photocopying from 20 to 30,000 documents. In her deposition, Ms. Ford testified that, prior to her June 2006 suspension, her medical condition was stable as related to the January 2000 injury. In May 2006, she scored a 3.12 on her performance review, which indicates that she was meeting the school district's expectations. A month later she was suspended in June 2006 upon allegations that she had allowed a confidential document to be taken from the copy room by her son without authorization to release the document or divulge its contents. Ms. Ford has failed to make out the first element of the prima facie case that she is disabled within the meaning of the ADA.

On the second prong of the prima facie case, the parties do not dispute that Ms. Ford is physically qualified to perform the essential functions of her former job of Machine Operator in the machine room. However, the School Corporation argues that, because an essential function of the job in the machine room is confidentiality and because there is an open question as to whether Ms. Ford made available the confidential document to her son, an employee of the School Corporation who was potentially adversely affected by the information in the confidential document and who was not entitled to receive the document. After Ms. Ford grieved her suspension, she was ultimately reinstated and reassigned to the position of Requisition Secretary at Lew Wallace High School. Ms. Ford then grieved this reassignment, seeking reinstatement in her job as Machine Operator. In an unfavorable decision, Ms. Ford was advised that her breach of confidentiality regarding confidential

documents entrusted to her as a Machine Operator was the paramount factor in the decision to place her as a Requisition Secretary at Lew Wallace High School and that "Article V § 9 of the Secretarial Bargaining Agreement states that involuntary transfer and demotions may be made by the Employer only for good and just cause." (Exs. SC43, SC25). Policy 616 on theft and conversion and Policy 438 regarding suspensions are set forth in the Factual Background. Ms. Ford has not offered any evidence to suggest that the decision was not made for good and just cause or that the School Corporation does not believe that she is not qualified for her former position.

On the third prong, Ms. Ford's June 2006 suspension could constitute an adverse employment action, even though she was ultimately reinstated and received full back pay. *See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) ("Typically, adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay."); *Turner v. Marshall Field & Co.*, No. 97 C 6354, 1999 WL 168465, at * 8 (N.D. Ill. Mar. 18, 1999). However, even if she had exhausted her administrative remedies as to her transfer and reassignment in October and December 2006 respectively, neither would constitute an adverse employment action, and her claim as to those actions would fail. An adverse job action "must be materially adverse, meaning more than a mere inconvenience or an alteration of job responsibilities." *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999). This includes termination, a demotion with a decrease in wages, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities. *Id.* "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001). Although Ms. Ford would prefer to return to her prior position in the machine room and her job responsibilities have changed, she has not shown that the material responsibilities

were "significantly diminished." Also, Ms. Ford has not suffered a decrease in wages or a material loss of benefits as she was hired in 1978 as a Secretary and remains employed by the School Corporation as a Secretary and Ms. Ford's salary, benefits, and job perks remained the same with the exception of annual salary *increases*.

Over all, Ms. Ford has not demonstrated that the reason she was suspended was because of her disability and, thus, has not made out a prima facie case of discrimination. Regardless, the School Corporation has articulated a legitimate non-discriminatory reason for her suspension, transfer, and reassignment, which Ms. Ford has not suggested, much less attempted to prove, is pretextual. The School Corporation states that Ms. Ford was suspended on the allegations that she had allowed confidential documents to be taken by or released to an unauthorized individual from the copy room where she was working as a Machine Operator. Once she was reinstated, she was reassigned in accordance with the CBA in December 2006 to the position of Requisition Secretary at Lew Wallace High School rather than being returned to her position as Machine Operator in the photocopy room because the School Corporation believed that she could not be placed in a position of confidentiality. In addition, the position of Machine Operator has been held by another employee since June 2006.

Ms. Ford has neither made out a prima facie case of disability discrimination nor demonstrated that the School Corporation's legitimate non-discriminatory reasons for her suspension, transfer, and reassignment are pretextual. Accordingly, summary judgment in favor of the School Corporation on Ms. Ford's ADA claim is appropriate.

## B.  State Law Claims

*1.  Exhaustion of Administrative Remedies*

The School Corporation argues that Ms. Ford failed to exhaust the full range of grievance and arbitration procedures available to her under the CBA on her state law claims prior to filing this lawsuit.  Ms. Ford responds that she grieved the June 21 suspension through Step 4 and that, because the outcome appeared on its face fully favorable, she is justified in not pursuing arbitration at Step 5.

The CBA sets forth a mandatory "Grievance Procedure" "in the event an employee believes there is a basis for a grievance."  (Ex SC25, p. 21).  The five steps of the mandatory grievance process are (1) the filing of an informal grievance with the immediate supervisor; (2) an appeal to the Supervisor of Secretaries; (3) an appeal to the Superintendent or her designee; (4) an appeal to the Board of School Trustees; and (5) an appeal to an arbitrator, who shall render a "final and binding" decision.

As noted above, Ms. Ford pursued her grievance of her June 21, 2006 suspension through Step 4 of the process, when, on November 17, 2006, the School Board vacated the suspension imposed by Mr. Jones, reversed the recommendation that her employment be terminated  and ordered that Ms. Ford be reinstated as an employee "with fully salary and benefits and [that she] receive pay dating back to the first day of suspension." (Ex SC2, p. 26). Ms. Ford did not file a Step 5 grievance within the ten days following the decision.  In her response brief, Ms. Ford explains that this decision at Step 4 appeared to be a "complete victory on the face" because she interprets the phrase "full benefits" in the November 16, 2006 decision to include reinstatement to the same job she previously held.  Pl. Br., p. 5.  Thus, she reasons that there is an open question as to the meaning

of "full benefits." Ms. Ford also grieved her December 2006 reassignment through Step 3 of the process where she received an unfavorable decision.

In the instant case, none of Ms. Ford's state law claims–intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation–fall within the CBA definition of a "grievance," which is a "dispute or controversy over the interpretation or application of the terms of the [CBA]." (Ex. SC25, p. 21). A determination of these state law claims is not inextricably intertwined with or substantially dependent on an analysis of the CBA.[1] Thus, Ms. Ford was not required to exhaust the grievance process for the state law claims she has filed in this court.

## 2. Merits of Ms. Ford's State Law Claims

### a. Intentional Infliction of Emotional Distress

In her Amended Complaint, Ms. Ford alleges that the School Corporation's "conduct as set forth and described" therein "constitutes extreme and outrageous conduct" with respect to the cause of action for intentional infliction of emotional distress. Under Indiana law, the tort is defined as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) (quoting *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (quoting Restatement (Second) of Torts § 46 (1965))). "It is the intent to harm one

---

[1] The School Corporation has not argued that these state law claims are preempted by the Labor Management Relations Act ("LMRA"). *See Jobes v. Tokheim Corp.*, 657 N.E.2d 145 (Ind. Ct. App. 1995) (finding, in a case in which plaintiff tested positive for illegal drugs while at work, that state law claims of defamation and invasion of privacy related to the drug test and the publication of the results were inextricably intertwined with an analysis of the collective bargaining agreement such that they were preempted by section 301 of the LMRA); *see also Johnson v. Guide Corp.*, No. 48A02-0707-CV-561, 2008 WL 696926 (Ind. Ct. App. Mar. 17, 2008) (finding that state law claim for liquidated damages and attorney fees under the Indiana Wage Payment Statute was preempted by section 301 of the LRMA because the claim was "substantially dependent on an analysis of the [collective bargaining agreement]" and did not require only "mere reference" to the collective bargaining agreement ).

emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress."

*Id.* (quoting *Cullison*, 570 N.E.2d at 31).  Conduct is "extreme and outrageous:"

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* (quoting *Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (quoting Restatement (Second) of Torts § 46 (1965))).  Ms. Ford offers no facts, argument, or analysis in her response brief in support of this claim.  The Court finds that Ms. Ford's claim of intentional infliction of emotional distress fails as a matter of law and summary judgment is granted because the School Corporation's actions of suspending, transferring, and reassigning in accordance with the CBA and with its policies on theft and conversion of services does not constitute extreme and outrageous conduct.

b.  Negligent Infliction of Emotional Distress

Regarding the claim for negligent infliction of emotional distress, Ms. Ford alleges in her Amended Complaint that she was "persecuted and discriminated against" and that the School Corporation "breached its duty of care to the Plaintiff to act as a competent and reasonable manager or superior . . . ."  Am. Cmplt., p. 8 ¶¶ 50-51.  Under Indiana law, to maintain a cause of action for negligent infliction of emotional distress, a plaintiff must satisfy the modified impact rule, which requires the plaintiff to demonstrate that she suffered a direct physical impact.  *See Powdertech*, 776 N.E.2d at 1263 (Ind. Ct. App. 2002) (quoting *Alexander v. Scheid*, 726 N.E.2d 272, 283 (Ind. 2000); *Condor v. Wood*, 716 N.E.2d 432, 434 (Ind. 1999); *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991)).  Although Ms. Ford argues that she suffered a "direct impact" as evidenced by visits

to a psychologist sponsored through the School Corporation's Employee Assistance Program and the fact that she is "deeply" concerned by alleged disparaging remarks made in her presence by her supervisor, Ms. Ford has not alleged a "direct *physical* impact" in her Complaint much less offered any evidence of a physical impact resulting from the School Corporation's alleged negligence. Ms. Ford is correct that the modified impact rule no longer requires a physical "injury" or that emotional trauma result from a physical "injury," but the rule does still require a physical impact. *Powdertech*, 776 N.E.2d at 1263 (citing *Ross v. Cheema*, 716 N.E.2d 435, 437 (Ind. 1999); *Condor*, 716 N.E.2d at 434; *Firstmark Standard Life Ins. Co. v. Goss*, 699 N.E.2d 689, 694-95 (Ind. Ct. App.1998). Accordingly, summary judgment in favor of the School Corporation on Ms. Ford's claim of negligent infliction of emotional distress is proper.

c. Defamation

1) Defamation *per se*

Under Indiana law, "[a] communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; (4) or sexual misconduct." *Baker v. Tremco Inc.*, 917 N.E.2d 650, 657 (Ind. 2009) (quoting *Schrader v. Eli Lilly and Co.*, 639 N.E.2d 258, 261 (Ind. 1994)). "Any statement actionable for defamation must not only be defamatory in nature, but false." *Trail v. Boys and Girls Clubs of NW Ind.*, 845 N.E.2d 130, 136 (Ind. 2006) (citing *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 687 (Ind. 1997)). The School Corporation argues that its conduct was privileged, citing *Baker v. Tremco, Inc.*, 917 N.E.2d 650, 657 (Ind. 2009). Ms. Ford agrees that statements made during the grievance procedure are protected but that any statements made after the proceedings were terminated are not

privileged.  Pl. Br., p. 7 (citing *Bd. of Sch. Com'rs of City of Indianapolis v. Pettigrew*, 851 N.E.2d 326 (Ind. Ct. App. 2006)).

In support of her claim for defamation *per se*, Ms. Ford argues generally that the School Corporation's activities amount to defamation per se because it has implied criminal conduct and misconduct in a trade or profession by Ms. Ford.  However, Ms. Ford offers no specific examples of any such statements.  Ms. Ford has not attached copies of the Post Tribune newspaper articles submitted by the School Corporation nor does she reference them in her brief.  To the extent Ms. Ford may be referring to these newspaper articles that were printed following her suspension, Ms. Ford has not identified any false statements therein regarding either her alleged conduct or her suspension.  Moreover, there is no statement in her Statement of Genuine Issues that she did not provide a copy of the privileged document to an unauthorized recipient–the alleged act for which she was suspended, and there is no such argument in her brief.

2) Defamation *per quod*

An action for defamation *per quod* requires a showing of (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages.  *Baker*, 917 N.E.2d at 657. In support of this claim, Ms. Ford states generally that the "employees continue to berate her in public forums" and offers two examples of such statements, neither of which constitutes defamation as a matter of law.

First, Ms. Ford contends, "They use foul and bad language," and cites her deposition testimony regarding two statements by supervisor James Piggee.  Pl. Br., p. 7 (citing App. p. 89). She describes an incident with James Piggee who "irritated" her.  She testified, "The last incident

he was very hostile to me was a couple weeks ago." Pl. Br., App. p. 89, Dep. p. 85. She defined "hostile" as "disrespect." *Id*. at Dep. p. 86. In support, she recounted the following conversation:

> A couple of weeks ago he was on the other side of the building and he called the main office. I picked up the phone. I said, "Good morning, Lew Wallace High School."
> And his statement was, "Tell Ms. Ford to get her ass down here now."
> And I said, "Excuse me?"
> And he hung up the phone. I reported it. Nothing.

*Id*. Ms. Ford testified at her deposition that she felt the statement was unprofessional and disrespectful. Ms. Ford has not demonstrated that this statement was published to a third person or heard by anyone other than her. *See Mart v. Hess*, 703 N.E.2d 190, 194 (Ind. Ct. App. 1998). Moreover, even if the comment had been heard by someone else, the communication must be made with "defamatory imputation," which is determined by testing whether the effect the statement is fairly calculated to produce and the impression it would naturally engender in the mind of the average person. *Newman v. Jewish Cmty. Ctr. Assn. of Indianapolis*, 875 N.E.2d 729, 739 (Ind. Ct. App. 2007). Again, the statement must also be false. This statement by Mr. Piggee does not constitute defamation. Ms. Ford also testified that Mr. Piggee "would scream [my] name in the office, you know." *Id*. (Dep. p. 87). As an example, she offered: "The way that he speaks to me, his verbal communication to me. He yells, 'Hey, Ford, I need you now.'" *Id*. These words do not bear a defamatory imputation as there is nothing untrue about the statement.

Second, Ms. Ford states in her brief as another example of employees "berating" her the statement: "They put unequal work loads on [me]." Pl. Br., p. 7 (citing App. p. 94, Dep. pp. 105-08). These pages of her deposition cited in support of this statement discuss her workload and how she felt she was given more work than others. However, these pages contain no examples of statements made by others. Ms. Ford's feelings regarding her workload cannot constitute

defamation because there is no "communication with a defamatory imputation" much less publication.

Because Ms. Ford's defamation claim fails as a matter of law, summary judgment in favor of the School Corporation is granted.

## C. Punitive Damages

The School Corporation also seeks summary judgment on Ms. Ford's claim for punitive damages. Although the Court has granted summary judgment in favor of the School Corporation on all of Ms. Ford's substantive claims, in the interest of thoroughness, the Court addresses the issue. The United States Supreme Court has held that punitive damages are not available under the ADA. *Barnes v. Gorman*, 536 U.S. 181, 189-90 (2002). Indiana law provides that "[a] governmental entity is not liable for punitive damages." Ind. Code § 34-13-3-4(b); *see also Miner v. Sw. Sch. Corp.*, 755 N.E.2d 1110, 1116 (Ind. Ct. App. 2001) (recognizing that the school corporation was not liable for punitive damages). Therefore, if Ms. Ford had survived summary judgment on any claims, punitive damages would not be available.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Motion of Defendant for Summary Judgment [DE 70]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendant Gary Community School Corporation and against Plaintiff Brenda Ford as to all of her claims.

So ORDERED this 30th day of March, 2010.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc: All counsel of record